AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Oklahoma

| | |
|---|---|
| United States of America<br>v.<br><br>**MARIA PEREZ**<br>*Defendant(s)* | )<br>)  Case No. 22-mj-420-CDL<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __July 7, 2022__ in the county of __Tulsa__ in the Northern District of Oklahoma, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(viii) | Drug Conspiracy |
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii) | Distribution of 500 Grams or More of a Mixture or Substance Containing Methamphetamine |

This criminal complaint is based on these facts:
See Attached Affidavit of TFO James Dawson, DEA

☑ Continued on the attached sheet.

_____
Complainant's signature

TFO James Dawson, DEA
*Printed name and title*

Sworn to before me by phone.

Date: July 8, 2022

_____
Judge's signature

City and state: Tulsa, OK

United States Magistrate Judge Christine D. Little
*Printed name and title*

## Affidavit in Support of an Arrest Warrant
## in the Northern District of Oklahoma

I, James Dawson, being duly sworn under oath, do hereby depose and state:

### Introduction and Agent Background

1. I am a police officer with the Tulsa Police Department (TPD) and have been so employed for approximately 15 years. I am presently assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer. I have a Bachelor's Degree in Sociology with an emphasis in Criminology from the University of Oklahoma. I am an investigative or law enforcement officer of the United States within the meaning of Federal Rule of Criminal Procedure 41.

2. During my time as a Narcotics Detective with TPD Special Investigations Division (SID), and as a TFO with DEA, I have participated in wire and physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, debriefings of informants and reviews of taped conversations and drug records. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed and the methods of payment for such drugs. I have participated in numerous complex conspiracy cases prosecuted within the federal justice system. I have trained other narcotics detectives within SID and I have taught numerous classes throughout the State of Oklahoma on overdose death murder investigations. I have completed formal training in narcotics investigations

from the Tulsa Police Academy and the DEA, and have received informal training received from more experienced investigators.

3. I have participated in over 500 drug-related criminal investigations. I have authored both federal and state search warrants, authored Title III affidavits, participated in Title III investigations, purchased drugs and narcotics ("controlled dangerous substances") on numerous occasions in an undercover capacity. I have gained a considerable amount of knowledge about drug trafficking organizations and their members through my training and experience. I have interviewed hundreds of defendants involved in the use, manufacture, transportation, and illegal sale of controlled dangerous substances. During the course of these interviews, I have inquired and learned how individuals involved in drug distribution schemes and networks use and disperse the illegal proceeds generated from the illegal sale of controlled dangerous substances, including but not limited to chemicals commonly utilized in the illegal manufacture of methamphetamine.

4. During the course of my training and interviews with various defendants, I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I also know that drug traffickers and others involved in criminal activity often use coded language to communicate about their illegal activities. Based on my training and experience, I know coded language is used by drug dealers to attempt to hide the true nature of the conversations.

5. The facts and statements in this affidavit are based in part on information provided by other law enforcement officers and on my personal observations and training and experience as an officer for TPD and DEA. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The information contained in this Affidavit in support of an arrest warrant for Maria Perez for violations of Title 21, United States Code, Sections 846 (Drug Conspiracy) and 841(a)(1) and (841(b)(1)(A) (Distribution of 500 Grams or More of a Substance Containing Methamphetamine), based on an ongoing investigation and law enforcement's encounter with Maria Perez on July 7, 2022.

## Probable Cause

6. In September of 2020, Investigators with the DEA Tulsa Resident Office (TRO) and the Tulsa Police Department (TPD) began investigating a highly complex Mexico-based drug trafficking organization (DTO) led by Jose Reyna and Armando Reyna, who reside in Mexico. This investigation has involved interception of numerous targets' wire and electronic communications, the service of numerous search warrants, the arrest of over 20 DTO members, the seizure of over 20 firearms, and the seizure of over 1000 kilograms of suspected methamphetamine.

7. During the course of this investigation, Maria Perez was identified as a member of the Reyna DTO. On May 20, 2022, investigators were authorized to intercept wire communications over Perez's telephone. Interception began on May 21, 2022. During this investigation, agents have learned that Maria Perez is

3

distributing methamphetamine and laundering drug proceeds for both Armando and Jose Reyna.

8. In May of 2022, DEA and TPD investigators made plans to purchase one kilogram of methamphetamine from the Reyna DTO in Tulsa, Oklahoma. TFO Mackenzie and SA Glanz made contact with a confidential source (CS) at a pre-determined location. The CS and the CS's vehicle were searched and no contraband was located. The CS then placed a call to Armando Reyna and arranged for the CS to meet an individual working for the DTO in the area of the Supermercados Morelos, located at 2119 S. Garnett Road, Tulsa, to purchase the methamphetamine. Agents then provided the CS with currency to purchase the methamphetamine.

9. Investigators followed the CS as he/she drove from the predetermined location to the Supermercados Morelos located at 2119 S. Garnett Road. While in the parking lot, the CS called investigators and stated that he/she was directed by Armando Reyna to go the Perez's Abarrotes located at 2176 S. Garnett Road and park in the parking lot. The CS was followed the Perez's Abarrotes parking lot. Investigators watched as Maria Perez exited the Perez's Abarrotes business carrying a red shoe box. Investigators watched Perez walk up to the driver's side of the CS's vehicle, make contact with the CS and give the CS the shoe box. Perez then walked back into Perez's Abarrotes and the CS drove away from the area.

10. Investigators followed the CS to a predetermined location and the CS gave investigators the shoe box that Perez handed to the CS. Inside the shoebox was a

4

gallon plastic bag containing a crystal substance consistent with a kilogram of methamphetamine. SA Glanz conducted a field test on the suspected methamphetamine and received a presumptive positive result for methamphetamine. The CS was shown a picture of Maria Perez and the CS identified her as the individual that sold the CS a kilogram of methamphetamine.

11. In June of 2022, investigators made plans to purchase one kilogram of methamphetamine from the Jose Luis Reyna Plancarte drug trafficking organization (DTO) in Tulsa, Oklahoma. Investigators utilized a DEA CS to arrange the purchase of 1 kilogram of methamphetamine from members of the DTO.

12. TFO William Mackenzie and I made contact with the CS at a pre-determined location. At our direction the CS began communicating with Armando Reyna and during the conversation, Reyna agreed to have a member of his DTO deliver a kilogram of methamphetamine to the CS. A short time later, a member of the DTO later identified as Juan Carlos Caro-Guardado exited 2711 S. 134th E. Avenue, the residence of Maria Perez, and got into a black Honda Accord. Caro-Guardado then drove to 216 S. Phoenix Avenue and parked the vehicle in the alley behind the apartment building. Caro-Guardado then got out of his vehicle and went towards apartment C. A short time later Caro-Guardado walked back to his vehicle and got in, then drove away from 216 S. Phoenix Avenue Apartment C.

13. Approximately 15 minutes later, Armando Reyna told the CS that he only had 430 grams of methamphetamine because everything wasn't ready. The CS agreed to purchase the 430 grams of methamphetamine.

5

14. While the CS was communicating with Armando Reyna, Reyna told the CS to go to Aldi grocery store located at 2100 S. 129th E. Avenue and that he/she would be meeting with a black Honda Accord.

15. Approximately 15 minutes later, TPD officers stopped the black Honda Accord and identified Caro-Guardado as the sole occupant. A search of the vehicle revealed a backpack containing a white plastic sack containing crystal substance consistent with methamphetamine. Officers also located a red iPhone lying in the passenger seat of the vehicle.

16. TFO Randy Mackenzie and I drove to the traffic stop and took possession of the suspected methamphetamine and the cell phone. The cell phone will remain in the Custody of the Tulsa Police Department. I conducted a field-test on the suspected methamphetamine and received a presumptive positive result for methamphetamine.

17. Approximately two hours after Caro-Guardado's arrest, investigators intercepted a call between Maria Perez and an unidentified Hispanic male. During the call, Perez and the Hispanic male discussed how much methamphetamine Caro-Guardado was arrested with. Perez told the Hispanic male "400 grams," indicating that she had intimate knowledge of the details of the transaction.

18. On June 17, 2022, at approximately 11:00 p.m., Maria Perez received a phone call from Caro-Guardado. Caro-Guardado told her that he was in the Marshal's custody and that he was in jail in Okmulgee, Oklahoma. Caro-Guardado told Perez that he thought the police were already onto him and Perez agreed, but that she

could not talk. Perez asked if Caro-Guardado was mad at her, and he stated that he wasn't, and that if they were out in the danger that it was going to happen one day and she knew that. Caro-Guardado asked if there was still money there, and if it was $10,000. Perez told Caro-Guardado not to say amounts, but that it was all there. Caro-Guardado told Perez that she should go to his house, and Perez said she was thinking the same thing, and not to say anything. Caro-Guardado told Perez to take the luggage bag, and Perez said she knew. Perez said she didn't know how to open the door and Caro-Guardado told her to knock it down or something.

19. On June 18, 2022, investigators noticed that at approximately 12:50 p.m., Perez's black Jeep Wrangler left her residence at 2711 S. 134th E. Avenue in Tulsa, Oklahoma. The vehicle pulled up in the alley of 216 S. Phoenix Avenue at approximately 1:13 p.m. Investigators are currently utilizing a camera to conduct surveillance on 216 S. Phoenix Avenue Apartment C. Investigators noticed that Perez and three of her children exited the Jeep and began coming and going from the apartment. Investigators watched as Perez and her children removed several boxes and some luggage from the apartment before driving away from the apartment. Investigators noticed that after driving away from the apartment, Perez returned to her residence at 2711 S. 134th E. Avenue in Tulsa, Oklahoma.

20. On June 18, 2022 at approximately 7:45 p.m., Maria Perez received a phone call from Caro-Guardado, who told her to make money from what she got from the house. Perez said she talked to Caro-Guardado's father and that "the man" was not going to send anything or anyone. Caro-Guardado told Perez to make money

7

and Perez said that with her job, she knew how to do that. Perez asked Caro-Guardado about the marbles from Mexico, the ones that were blue. Perez asked if they were sold in large or small quantities. Perez asked if it was 1000 or what, and Caro-Guardado said it was 2000. Perez said she was going to order some but didn't know how many, and Caro-Guardado said it was 2000, then added that it was 1000 and 1000.

21. Investigators believe that this communication was significant because investigators now know that Perez picked up controlled substances from 216 S. Phoenix Avenue Apartment C earlier that day and took those controlled substances to her residence at 2711 S. 134th E. Avenue in Tulsa, Oklahoma. Investigators also believe that Caro-Guardado was telling Perez to distribute the controlled substances to make money. Additionally, Perez stated that she also knows how to make money with her job, which investigators believe is in reference to being paid to wire drug proceeds. With my training and experience I suspect that "blue marbles" is a street term for M30 fentanyl pills which are round and blue in color.

22. On July 6, 2022, the Honorable Christine D. Little authorized a search warrant for the residence of Maria Perez, 2711 S. 134th E. Avenue. On the morning of July 7, 2022, investigators approached Maria Perez and placed her in custody. At this time she was transported to the DEA TRO where she signed a Miranda rights waiver and was interviewed. During the interview she made the following statements:

- That she knows Armando Reyna, and initially met him in Tulsa, Oklahoma, when he was dating her friend.

- That she went to the residence at 216 South Phoenix Avenue following Caro-Guardado's arrest and retrieved money and the blue pills, along with personal affects.

- She initially stated that she would tell investigators where the blue pills were, but in the end refused to do this.

- When asked about the kilogram of methamphetamine in the red shoe box that she had delivered to the individual in the parking lot of her workplace, she denied this was drugs and claimed it was shoes.

23. Following this interview, members of the DEA TRO and the Tulsa Police Department executed the search warrant at the residence of Maria Perez, 2711 S. 134th E. Avenue. Upon searching the residence, investigators located a large sum of bulk currency, multiple cellular phones, and suspected drug notations. These notations included notations indicating that Perez had sold the 2000 fentanyl pills that had been discussed in the calls between Perez and Caro-Guardado.

## Conclusion

24. Based on the foregoing, I submit that probable cause exists to believe Maria Perez has violated Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A)(viii) (Drug Conspiracy and Distribution of 500 Grams or More of a

Substance Containing Methamphetamine) and respectfully request that a warrant for the arrest of Maria Perez be issued.

---

James A. Dawson, TFO
Drug Enforcement Administration

Sworn and subscribed to ~~before~~ me this by telephone  8th  day of July, 2022.

---

Christine D. Little
United States Magistrate Judge